[No. 2039.]

William Bryson v. The State.

Rape — Practice — Privilege of Counsel.— Note in the opinion the sug-
gestion of this court as to proper scope of argument of criminal causes,
especially of high degree; and also its disapproval of the line of argument
pursued by counsel for the State, which was entirely outside of the record,
and so calculated to inflame the minds and unduly excite the prejudices of
the jury against the accused that a new trial is awarded him by this court.

Appeal from the District Court of Gonzales. Tried below before
the Hon. George McCormick.

The conviction in this case was for the rape of Jennie Webb, in
Gonzales county, Texas, on the 5th day of August, 1885. A term
of five years in the penitentiary was the penalty assessed against
the appellant.

Jennie Webb was the first witness for the State. She testified
that she was the woman alleged in the indictment to have been
raped. The defendant on trial, William Bryson, was the man who
raped the witness. The offense was committed by the defendant
upon the person of the witness in Gonzales county, Texas, on the
5th day of August, 1885. At that time the witness lived with her
husband, Joe Webb, at his house, about three quarters of a mile
from the house of Anderson Yoakum, who was the witness's
brother-in-law. Between 12 and 1 o'clock on the 5th day of August,
1885, after dinner had been eaten, and the table cleared off, the
witness went to her husband, then lying on the gallery of their
house, and told him that she was going to the house of her brother-
in-law, the said Anderson Yoakum, and direct him to send a request
to the minister who for some time had been conducting a protracted
meeting in the neighborhood, to continue the services a while longer.
The witness accordingly started to Anderson Yoakum's house, leav-
ing her husband and Anna Allen at the house, the former lying
down on the gallery and the latter sitting out in the yard under a
tree. When the witness reached a point about four hundred yards
from her house she was startled by the shaking of a brush. Look-
ing in the direction of the noise, she saw the defendant, in his shirt
sleeves. The witness hallooed, when the defendant pulled a pistol,
came up to, and caught the witness by one of her hands, and
led her to a clump of bushes some distance from, and to the left of
the road, where he stopped and told witness that he wanted to cop-
ulate with her, and that she must lie down. The witness told him

that she was both a married woman and a member of the church, and could not comply with his demand. Defendant then presented his pistol and ordered the witness to lie down, and the witness, fearing the consequences of refusal, and protesting, complied. The defendant then lay down upon her and inserted his male member into her privates. Witness wept bitterly throughout the act of carnal intercourse, and the defendant told her that he would kill her if she did not hush up. When the defendant got through, and got up, he detained the witness by the hand, and while the two were standing there, witness heard her husband halloo. Defendant then released the witness and told her that he would kill her if she ever reported the outrage. Witness went on to the house of her brother-in-law, Anderson Yoakum, whither she had started, and had just got there, and was commencing to tell Anna Allen and Sallie Robinson about the outrage perpetrated upon her, when her husband and Anderson Yoakum rode up, and witness told them. Her husband and Anderson Yoakum left immediately to hunt for the defendant. The witness had never seen the defendant before he stopped her in the road, and compelled her to submit to his passion. The witness did not consent to the act of sexual intercourse, and submitted because she was afraid the defendant would kill her.

Cross-examined, the witness testified that she had been married ten or eleven years. She had never had any children. Witness cooked dinner on the day of the outrage. No one was at the house save herself, her husband and Anna Allen. Witness ate no dinner herself. The road from the witness's house to that of Anderson Yoakum was a common neighborhood road through a well timbered and bushy country. It was rather a crooked road. The place where the witness met the defendant was in sight of, or could be seen from, the witness's house, where she had just left her husband and Anna Allen. She was unable to state how far it was from the road to the point in the bushes where the defendant made her lie down and submit to his act of copulation. It may have been twenty, fifty, one hundred or even two hundred yards. She did not know how long the defendant kept her on the ground or stayed on top of her. She would not limit that time to one or ten minutes, or one or two hours. She did not know how long it was. She could not say how long it was after the act of copulation when she heard her husband halloo. She could not say how long, after he had outraged her, the defendant detained her at the place holding her by the hands. The witness could not say from which direction she heard the call of her husband, at the time she was detained by the defend-

ant after the act of copulation. She did not know whether her husband was then north, south, east or west of them, or towards home or Anderson Yoakum's house, nor could she say that her husband, when he hallooed, was within a hundred yards or two miles of her and the defendant. The rape was perpetrated in a thicket of bushes.

Joe Webb testified, for the State, that he was the husband of Jennie Webb, the prosecuting witness. He and Jennie had been married eleven years, during the whole of which time they had lived together as man and wife. Witness remembered the occasion upon which his wife is alleged to have been raped by the defendant. It occurred in Gonzales county, Texas, on the 5th day of August, 1885. Witness was at home and ate dinner there on that day. Anna Allen was there. She and Jennie sat down to dinner with the witness, but witness did not remember whether they ate any or not. After eating his dinner the witness went out on his gallery and laid down upon a bed which stood out there, but did not go to sleep. After a time Jennie came to the bed on which the witness was lying, and said that she was going over to Anderson Yoakum's to send word to a minister who was conducting a series of meetings in the neighborhood not to leave, but to keep the meetings up. She presently left home, going in the direction of Yoakum's house, traveling down the neighborhood road. After a little while, witness not yet having gone to sleep, he heard his wife call: "Joe, oh, Joe! Come here quick!" The witness paid no attention to this call, further than to tell his sister, Anna Allen, to go down the road and see if Jennie had not found a snake. Anna went off, and after a while came back and told witness that a white man had Jennie by the hands and was leading her off into the bushes. The witness then looked down the road and saw a man leading his wife through the bushes near the road. Witness knew his wife by the color of her dress. He then ran into the house, got his gun, and started in the direction of the point where he saw his wife and the man. Witness went to that place in a run, and when he reached it he hallooed. Witness could see nor hear nothing either of the man or his wife. Anna Allen, who started with the witness, went on to Anderson Yoakum's house, and after a time Yoakum joined witness, who remained searching the woods. Yoakum brought the witness a horse. Anderson Yoakum and witness continued the search, finding no traces of the man or Jennie, until they heard some one halloo at Yoakum's house. They then went to Yoakum's house, and found Jennie and two other women, and Jennie told witness about being raped. The point at which witness saw the white man and his

wife, after Anna Allen told him that a white man was taking his wife into the bushes, was about four hundred yards down the road from his house, towards Anderson Yoakum's house. The witness and Jennie, for the first two years after their marriage, lived on the place of Mr. John Z. Bell in De Witt county, Texas. Thence they moved to Mr. Blackwell's place on Deer creek, in De Witt county, and lived there six years. Thence they moved to the Summers place, and lived there two years; and, in the fall of 1884, they moved to the place in Gonzales county occupied by them when this offense was committed. It was between 12 and 1 o'clock when Jennie started to Anderson's house, which house was situated about three quarters of a mile distant from the witness's house.

Cross-examined, the witness testified that he did not get up from bed when he heard his wife halloo. He did not get up until Anna Allen told him that she saw a white man leading Jennie from the road into the bushes. Witness then got up, looked in the direction of Yoakum's house, and saw the white man and Jennie. The road which led from witness's house was a common neighborhood road, through a timbered and brushy country. Yoakum's house was east from the witness's house. The white man and Jennie, when witness saw them together, were to the left of the road. They were going in a north direction when witness last saw them together.

Anna Allen testified, for the State, that she was Joe Webb's sister and Jennie Webb's sister-in-law. She was living with Joe and Jennie Webb on the 5th day of August, 1885, the day on which the rape was alleged to have been committed. Jennie Webb cooked dinner on the day of the alleged rape. Witness and Joe Webb ate dinner, but Jennie did not. After eating his dinner, Joe went out on the gallery and lay down on a bed. Jennie and the witness then cleared off the table, washed and put away the dishes, and Jennie went to the bed where her husband was, and a short conversation between them ensued. Jennie then started off down the road to Anderson Yoakum's house. The witness got a chair and took her seat out in the yard under a tree. She had been there but a short time when she heard Jennie exclaim in a loud voice: "Oh Lord! have mercy on me." She looked in the direction of the voice, and saw a white man leading Jennie off into or towards the brush. Witness then went to the gallery and told Joe what she had seen. Joe got up instantly, and, the witness supposed, saw them, as they were still in sight, going towards the bushes. Joe then got his gun and he and witness started in a run towards the point where the white man and Jennie were last seen. The witness being unable to keep

up, she was told by Joe to keep on to Anderson Yoakum's and bring him a horse. Witness went on to Yoakum's and delivered the message, and Yoakum got a horse and started to find Joe. Some time later Jennie came up to Anderson Yoakum's house. Witness and Sallie Robinson met her about fifty yards from the house, and hallooed to Joe and Anderson that she had come in. Joe and Anderson rode up presently, and Jennie told them about the outrage.

Cross-examined, the witness testified that when she heard Jennie halloo she looked up the road and saw the white man take hold of Jennie. Jennie was in the road at the time. The man led her from the road, on the right hand side, towards some bushes. Witness said nothing to Joe for the next ten minutes, during which she sat still in her chair. As soon as she told Joe, he got his gun, and he and witness started. The point in the road where the man and Jennie met was about four hundred yards from the house. Witness had never before seen the man about the place.

Georgia Ann Taylor testified, for the State, that, on the 5th day of August, 1885, she was washing at the Black Jack springs near Anderson Yoakum's place, in Gonzales county, Texas. While thus engaged the witness chanced to look up from her work, and saw a white man sitting on a knoll close to the spring. . Witness identified the defendant as that man. It was about dinner time when the witness saw the defendant at the spring. Witness heard of the rape of Jennie Webb on the next day. Mr. Tom Coffal came to the spring and got a drink of water while the defendant was sitting near the spring. The defendant was still sitting on the knoll where the witness first saw him. Jake Yoakum's house was in full view of the spring. Witness did not see a horse about the spring. She had her baby with her at the wash-place. The witness did not know how long she remained at the spring, but she had only a few clothes to wash.

Cross-examined, the witness testified that she did not know when the defendant came to the spring, nor did she know when he left it. He did not speak to the witness. The State closed.

Tom Coffal was the first witness for the defense. He testified that he knew Jennie Webb, the woman alleged to have been raped by the defendant, and had known her from her childhood. He was well acquainted with her general reputation for chastity, in the community in which she lived, and he knew it to be bad. The witness knew the defendant, William Bryson. The defendant, at the time of the alleged rape, was living with his mother-in-law, some two and a half or three miles from Joe Webb's house.

Cross-examined, the witness stated that he had known but little about Jennie Webb for the past eight years, until this prosecution was instituted. The last time, prior to this trouble, that the witness saw her, was when she lived on the San Antonio river, about eight years before this trial. She was then single. Witness had not heard a great deal of her since then. His testimony as to her reputation for chastity was based upon the reputation she sustained at and before that time. On the day of the alleged rape of Jennie Webb by the defendant, at about 12 o'clock, the witness saw the defendant at the Black Jack springs within one hundred and fifty yards of Jake Yoakum's residence, and in plain view of Jake's house. Georgia Ann Taylor was at the spring at the same time, doing some washing. Witness remained at the spring only long enough to borrow a bucket from Georgia and get some water. He did not hear or see the defendant speak to Georgia Ann Taylor. They were both at the spring when the witness left. Joe Webb, at the time of the alleged rape, lived about three quarters of a mile from Black Jack springs.

Joe Sunday testified, for the defense, that he was acquainted with Jennie Webb, the prosecutrix in this case, and had known her from her childhood. He was acquainted with her general reputation for chastity in the community in which she lived, and knew that it was bad.

Cross-examined, the witness stated that he had known nothing of Jennie for ten or twelve years, and had not seen her for several years. Joe Webb and Jennie, during the last year, had lived within half a mile of witness, and witness had often passed their house, but had never seen Jennie. The witness knew nothing personally about Jennie's character, and based his testimony upon what he knew generally of her reputation when he knew her, and the fact that he had heard that her own father was once indicted for incest with her in the district court of Karnes county. This latter statement had been made to witness since the institution of this prosecution. The witness was not present in court in answer to a *subpœna*, but was here to answer in a case against himself. Witness had known the defendant some eight or ten years. He knew defendant first when he, defendant, lived with Doctor Griffin, then with Manning Clements. The defendant never had a home of his own that the witness was aware of. Defendant left the country about the time that Clements did, and the witness did not hear of him again until as defendant in this case.

Jack Odom testified, for the defendant, that he lived in Karnes

county, Texas, and had lived in that county for a number of years. He knew the prosecutrix in this case — Jennie Webb — and knew her general reputation for chastity to be bad.

Cross-examined, the witness testified that he knew as a fact that Jennie's father was indicted in Karnes county about twelve years before this trial, for incest with her, and that it was generally known in the community that, when a girl, and engaged in herding horses in the woods, she would meet the boys promiscuously and serve their carnal appetites. The witness was in the district court room of Karnes county when the indictment against Jennie's father for incest with her was dismissed. If her father was ever re-indicted and tried for the alleged incest with Jennie, witness had never heard of it. Witness had known nothing of Jennie since her marriage. She appeared to be about twenty-eight years old.

G. W. Evans testified, for the defense, that he knew Jennie Webb, and knew that her reputation for chastity was bad.

On his cross-examination, respecting the basis of his knowledge upon which he testified to Jennie Webb's reputation for chastity, the witness testified substantially as did the witness Sunday. He testified further that he was not personally acquainted with Jennie Webb, and did not know where she was living, and had never heard anything charged against her chastity until after the indictment of Bryson for raping her.

The motion for new trial raised the question discussed in the opinion.

*Ponton & Fly,* for the appellant.

*J. H. Burts,* Assistant Attorney-General, for the State.

Hurt, Judge. This is a conviction for rape, appellant's punishment being fixed by the verdict at five years' confinement in the penitentiary.

The first assignment of error is: "The court erred in permitting the objectionable remarks of the district attorney, Mr. Spooner, in the closing argument to the jury."

The bill of exceptions shows that the district attorney used the following language in substance: "That during last year eight colored females and five white females were ravished and murdered in the city of Austin. That an honest carpenter had gone to bed, and in the night some hellish villain, like the defendant at the bar, had come and killed him, and then ravished and killed his wife and left

her in a nude condition for the horrified populace to gaze upon." To all of which the defendant objected at the time, called the attention of court to the same, and asked that the district attorney be restrained from further pursuing his line of argument, and that the jury be instructed that they should not be influenced in finding their verdict by giving any weight to said objectionable arguments; which objection was overruled by the court, and the district attorney allowed to proceed.

Under the decisions of this court upon similar conduct of prosecuting attorneys, we feel it our duty to reverse this judgment. Our views upon this matter cannot be better expressed than is done in *Gazley* v. *The State*, 17 Texas Ct. App., 267, by Judge Willson. In this as in that case the appellant was upon trial for *rape*, the very mention of which arouses public indignation, and fires the minds and passions of a community with a desire for vengeance against the guilty party. In such cases *especially* the court and counsel engaged in the trial should be scrupulously cautious to accord to the defendant a fair and impartial trial, as free as possible from excitement or prejudice. There should be no clap-trap or sharp practice made use of by counsel for the State. No improper means should be resorted to to prejudice the minds of the jury against defendant in the remotest degree. No testimony should be offered on the part of the prosecution that is known to the prosecution to be not relevant and legal. No remarks should be made by counsel for the state *which are not fully warranted by the evidence*. Matters not in evidence should not even be alluded to in argument, when such matters might possibly prejudice the defendant.

In this case what had the defendant to do with, or in what manner was he connected with, the fearful tragedies that had occurred at Austin? Nothing whatever. Is it legitimate for counsel for the prosecution to insist in argument upon the prevalence of crime, or even similar crimes to that under trial, in order to obtain a conviction? Hear what Mr. Bishop says upon this subject: " Counsel are entitled to employ with the jury only legitimate argument. To indulge in vituperation and abuse of the party, or urge that if the defendant is not convicted the prosecutor will be ruined, or be deemed convicted of perjury, or inflame them with the idea that justice has not been well administered heretofore, and therefore the defendant must not be acquitted, is irrelevant while it is unjust. The jury 'should decide,' says Compton, judge, 'upon the case solely upon the weight of evidence, and not with reference to the supposed consequences to one side or the other.' Of the like sort

is the expression, by a defendant's counsel, of belief in his client's innocence."

"If counsel undertake what is thus inadmissible in argument, it is the right of counsel on the other side to object. And whether objection is made or not, the court may stop it; and, the author submits, a due regard for the purity of public justice demands that courts should oftener interfere in this way than is common. Not in all circumstances can an error of this sort in the presiding judge be corrected by a higher tribunal; but in some it can, as by granting a new trial." (1 Bish. Cr. Proc., 975*a*, 975*b*.)

This court has very often corrected such errors by reversing a judgment of conviction obtained by such methods, and granting a new trial, and we feel constrained to do so in this case, because in our judgment the remarks excepted to were outside of the evidence, and were calculated to inflame the minds and excite the prejudices of the jury unduly against the defendant.

The judgment is reversed and the cause remanded for another trial.

*Reversed and remanded.*